

RECEIVED
ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD

DEC 17 2018

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PEDRO RODRIQUEZ,

                    Plaintiff,

      vs.

JAMES DZURENDA,

              Defendant.

Case No. 3:17-cv-00205-MMD-CBC

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

This case involves a civil rights action filed by Plaintiff Pedro Rodriguez ("Rodriguez") against Defendant James Dzurenda ("Dzurenda") in his official capacity as director of the Nevada Department of Corrections ("NDOC"). Currently pending before the Court is a motion for temporary restraining order and/or preliminary injunction filed by Rodriguez. (ECF No. 15). In the motion, Rodriguez requests that the Court enter a restraining order and/or injunction prohibiting Dzurenda and/or NDOC from enforcing NDOC Administrative Regulations ("AR") AR 810 and 810.1 to the extent the regulations "entirely preclude" Rodriguez from practicing his chosen religious faith of Satanism and from "purchasing, obtaining, and/or possessing" any religious artifacts he claims are necessary to practice his religion." (*Id.*, p. 1). Dzurenda opposed arguing Rodriguez failed to establish any of the necessary factors required to the imposition of a restraining order or injunctive relief (ECF No. 17). In reply, Rodriguez alleges Dzurenda's opposition is misleading and that Rodriguez

has in fact established each necessary element for injunctive relief.  (ECF No. 19.) For the reasons stated below, the Court recommends Rodriguez's motion for temporary restraining order and/or preliminary injunction (ECF No. 15) be denied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Procedural History

Rodriguez is an inmate in the custody of NDOC, and is currently housed at Ely State Prison ("ESP") in Ely, Nevada.  (ECF No. 7.)  On April 3, 2017, Rodriguez submitted a civil rights complaint pursuant to RLUIPA and 42 U.S.C. § 1983 together with an application to proceed in forma pauperis.  In the complaint, Rodriguez asserted two claims for relief against Dzurenda seeking declaratory, injunctive, and monetary relief.  (*Id.* at 1-2; 14.) Rodriquez's claims arise from the fact that his chosen faith, Satanism, is not a recognized faith under NDOC's administrative regulations.

Pursuant to 28 U.S.C. § 1915A(a), the Court screened Rodriguez's complaint on April 11, 2018.  (ECF No. 6.)  The Court determined all of the following claims stated a cause of action: (1) the First Amendment right to Free Exercise and the Fourteenth Amendment right to equal protection claims against Dzurenda contained in Count I; and, (2) the RLUIPA claim against Dzurenda contained in Count II.  (*Id.*)  On November 26, 2018, Rodriguez filed to amend his complaint to include a Count III (ECF No. 25), the Court has yet to rule on whether to allow this amendment.

### B.    Factual Background Related to Count I

In Count I, Rodriguez asserts Dzurenda violated his rights to freedom of religious exercise and equal protection under the First and Fourteenth Amendments because, as the director of NDOC, he has denied inmates of the Satanic faith official recognition as a religion under ARs 810 and 810.1 and the religious rights and privileges afforded inmates of other faiths at ESP.  (ECF No. 7 at 4-8.) Rodriguez claims he filed "three separate 'Request for Accommodation of Religious Practice' forms requesting that NDOC add

1   Satanism and various ritual property items to the NDOC Religious Practice Manual" and

2   neither ESP's chaplain nor the Religious Review Team ("RRT") responded.   (*Id.* at 5.)

3   Subsequently, Rodriguez initiated the NDOC administrative grievance process and was

4   denied at each level.

5        Rodriguez asserts that this has prevented him, and other Satanists, from accessing

6   religiously significant property such as "[a]n alter, alter cloth, amulets, bell, chalice, elixir,

7   herbs and incense, gong, medallion (of a pentacle disc or pentagram of Satan), parchment

8   paper, phallus, picture of Baphemet, robe (black, cowled or hooded), and a talisman." (*Id.*

9   at 6-7.) As well as the space necessary to conduct religious rituals. (*Id.* at 7.) Accordingly,

10  Rodriguez asserts that he has been substantially burdened in his free exercise and

11  expression of religion. (*Id.* at 7-8.)

12       C.   Factual Background Related to Count II

13       In Count II, Rodriguez asserts that Dzurenda has placed substantial burdens on his

14  exercise of the Satanic religion in violation of RLUIPA. (*Id.* at 9-10.) Specifically, he asserts

15  the implementation of AR 810 and 810.1 violate his rights under RLUIPA because Satanism

16  is not recognized as a legitimate faith group, and as such, he is prohibited from being able

17  to "obtain, possess and engage in religious exercise and or rituals mandated by [sic]

18  [Satanism]". (*Id.*)  Furthermore, he claims that Dzurenda cannot state a compelling state

19  interest to warrant this substantial burden on Rodriguez's exercise of religion, and that

20  Dzurenda failed to consider the least restrictive means available. (*Id.*)

21       C.   Rodriguez's Motion for TRO and/or Preliminary Injunction

22       On August 16, 2018, Rodriguez filed a motion for temporary restraining order and/or

23  preliminary injunction on these counts. (ECF No. 15.)[1]  In the motion, Rodriguez requests

24  an order that enjoins Dzurenda, his agents, and employees from enforcing AR 810.1 "to

25

26  [1]    The motion for temporary restraining order or preliminary injunction (ECF No. 15) was
    made prior to the motion to amend the complaint (ECF No. 25). The motion to amend seeks
27  to add a third count and does not change either of the counts at issue in this motion.

the extent it entirely precludes Mr. Rodriguez from both engaging in any religious practice and, purchasing, obtaining and or possessing any religiously mandated property items identified in AR 810.1, comparable to other similarly situated prisoners." (*Id.* at 1-2.)

He argues that under Count I a TRO or PI is appropriate should be entered because he is likely to succeed on the merits. First, he argues that there is no legitimate penological interest for failing to recognize Satanism under AR 810.1. Moreover, he claims he is likely to succeed because he filed three (3) separate RRT forms to have Satanism added to AR 810.1 that were never responded to and NDOC has made no effort to accommodate him. Next, he argues that if an injunction is not entered he will suffer irreparable harm because as is he is entirely precluded from practicing "any" aspect of his religion. In addition, he claims that an injunction is appropriate at this time because the balance of equities tips in his favor because "allowing him to practice and purchase and possess religious property that his fellow prisoners enjoy imposes no burden on NDOC," and the relief sought is in the public interest because his constitutional rights are being violated. (*Id.* at 9-15.)

Furthermore, Rodriguez argues that under Count II a TRO or PI is appropriate because AR 810.1 "imposes a substantial burden upon his religious exercise and the exclusion of Satanism from AR 810.1 serves no compelling state interest," thus violating RLUIPA. (*Id.* at 16-17.)

In response, Dzurenda argues that a TRO or PI should not be entered because Rodriquez has failed to establish that any of the necessary factors for the imposition of such relief. First, Dzurenda argues Rodriquez is not likely to succeed on the merits because there is no evidence he filed three (3) separate forms to have RRT recognize Satanism as a religion, he has not attempted to lay claim to a religious right, and Dzurenda does not sit on the RRT and does not determine what religions are allowed. (ECF No. 17, pp. 1-8). In addition, Dzurenda argues Rodriquez has failed to establish he will suffer irreparable harm if a TRO or PI is not granted because he is not being prevented from privately practicing his religion and is "free to practice his religion in his cell like any other practitioner via

-4-

prayer." (*Id.*) Finally, Dzurenda asserts the balance of equities is not in Rodriquez's favor because he is not in any danger and there is a legitimate penological interest in requiring inmates to apply to have a new religion recognized and the public interest is not served by unnecessarily ordering a prison institution to allow unapplied for religious practices. (ECF No. 17 at 1-8.) In support of his opposition, Dzurenda attached the Religious Practice Manual used by NDOC, which lays out the process for filing for recognition of a New Faith Group (*Id.* at Ex. A, pp. 14-15), and the Declaration of Richard Snyder, the chaplain at ESP during the relevant time period, wherein he states that there is no record of Rodriguez having submitted a Request for Accommodation of Religious Practices from January 2016 to present. (*Id.* At Ex. D, p. 3.)

In reply, Rodriguez claims he properly demonstrated each element for injunctive relief. (ECF No. 19.) He claims that his injury stems from the NDOC policy itself which excludes Satanism as a recognized religion, which "altogether precludes [him] from practicing his faith". (*Id.*) He claims that he can succeed on the merits because the declarations he included as Exhibits 1 and 2 in his motion suffice as evidence that he sought a religious accommodation. (*Id.*) Next, Rodriguez refutes Dzurenda's Exhibit D and argues that "without some basic level of processing protections or controls . . . no inmate can provide objective evidence of compliance with AR 810," thus the Court must credit his version of facts. (*Id.*) Finally, Rodriguez argues that because he has been denied the ability to purchase or obtain certain religious objects, he is precluded from practicing his religion resulting in irreparable harm. (*Id.*)

## II.    LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). A preliminary injunction is an "extraordinary and drastic

remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008) (quotation marks and citation omitted). The instant motion requires the Court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 129 S.Ct. at 374 (citations omitted).

Before *Winter*, courts in the Ninth Circuit applied an alternative "sliding-scale" test for issuing a preliminary injunction that allowed the movant to offset the weakness of a showing on one factor with the strength of another. *See Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005). In *Winter*, the Supreme Court did not directly address the continued validity of the Ninth Circuit's sliding-scale approach to preliminary injunctions. *See Winter*, 129 S.Ct. at 392; *see also Alliance*, 632 F.3d at 1131. The Ninth Circuit has since found that post-*Winter*, this circuit's sliding-scale approach, or "serious questions" test survives when applied as part of the four-element *Winter*'s test. *Alliance*, 632 F.3d at 1131-32. "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* (citations omitted). The portion of the sliding-scale test that allowed injunctive relief upon the possibility, as opposed to likelihood, of irreparable injury to the plaintiff, was expressly overruled by *Winter*. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

An even more stringent standard is applied where mandatory, as opposed to prohibitory preliminary relief is sought. The Ninth Circuit has noted that although the same

1    general principles inform the court's analysis, "[w]here a party seeks mandatory preliminary

2    relief that goes well beyond maintaining the status quo pendente lite, courts should be

3    extremely cautious about issuing a preliminary injunction." *Martin v. International Olympic*

4    *Committee*, 740 F.2d 670, 675 (9th Cir. 1984); *see also Committee of Cent. American*

5    *Refugees v. Immigration & Naturalization Service*, 795 F.2d 1434, 1442 (9th Cir. 1986).

6    Thus, an award of mandatory preliminary relief is not to be granted unless both the facts

7    and the law clearly favor the moving party and extreme or serious damage will result. *See*

8    *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Anderson v. United*

9    *States*, 612 F.2d 1112, 1114 (9th Cir. 1979)).

10         Finally, the Prison Litigation Reform Act (PLRA) mandates that prisoner litigants

11    must satisfy additional requirements when seeking preliminary injunctive relief against

12    prison officials:

13         Preliminary injunctive relief must be narrowly drawn, extend no further than
14         necessary to correct the harm the court finds requires preliminary relief, and
         be the least intrusive means necessary to correct that harm.  The court shall
15         give substantial weight to any adverse impact on public safety or the operation
         of a criminal justice system caused by the preliminary relief and shall respect
16         the principles of comity set out in paragraph (1)(B) in tailoring any preliminary
         relief.
17

18    18 U.S.C. §3626(a)(2).    Thus, section 3626(a)(2) limits the Court's power to grant

19    preliminary injunctive relief to inmates. *Gilmore v. People of the State of California*, 220

20    F.3d 987, 998 (9th Cir. 2000). "Section 3626(a)(2) . . . operates simultaneously to restrict

21    the equity jurisdiction of federal courts and to protect the bargaining power of prison

22    administrators- no longer may courts grant or approve relief that binds prison administrators

23    to do more than the constitutional minimum." *Id.* at 999.

24         The standard for issuing a temporary restraining order is identical to the standard for

25    preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co.*, 240

26    F.3d 832, 839 n.7 (9th Cir. 2001); *Winnemucca Indian Colony v. United States ex rel. DOI*,

1 | 837 F.Supp.2d 1184, 1188, 2011 U.S. Dist. LEXIS 108152, 2011 WL 4377932 (D. Nev.,

2 | Sept. 12, 2011).

3 | **III.    Discussion**

4 |     A.    <u>Likelihood of Success on the Merits</u>

5 |         Plaintiff has failed to establish a strong likelihood of success on the merits on either

6 | of his claims for relief. As a starting point, prisoners do retain their First Amendment rights

7 | which include the right to free exercise of religion. *See O'Lone v. Estate of Shabazz*, 482

8 | U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).  To this end, inmates enjoy the

9 | privilege of a "reasonable opportunity" to worship and have clergy or spiritual leaders visit

10 | them.  *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).  The

11 | limitations on this free exercise arise from the fact of incarceration and penological

12 | objectives. *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987).

13 |         RLUIPA provides that "[n]o [state or local] government shall impose a substantial

14 | burden on the religious exercise of a person residing in or confined to an institution," unless

15 | it meets the strict scrutiny standard of furthering a compelling governmental interest by the

16 | least restrictive means possible.  42 U.S.C. § 2000cc-1(a)(1)-(2).  The RLUIPA replaced

17 | the penological interest standard with the strict scrutiny standard. *Warsoldier v. Woodford*,

18 | 418 F.3d 989, 1001-1002 (9th Cir. 2005); *see also Cuttler v. Wilkinson*, 544 U.S. 709, 717,

19 | 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

20 |         The United States Supreme Court set forth the *Turner* factors to ascertain the

21 | reasonableness of a prison regulation: (1) a valid, rational connection between the

22 | regulation and the legitimate governmental interest; (2) the existence of an alternative

23 | means of exercising the right; (3) the impact of accommodation on the guards and other

24 | inmates as well as the allocation of prison resources; (4) the absence of ready alternatives

25 | which supports reasonableness of the government regulation. *Turner v. Safley*, 482 U.S.

26 | 78, 89-90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1983).  The effect of RLUIPA on the *Turner* test

27 | is simply the insertion of the burdens on the strict scrutiny standard: to determine if the

intrusion is the least restrictive means of accomplishing the compelling government interest.  The Supreme Court has considered RLUIPA and held that it does not eliminate the deference given to prison administrators who are charged with running state institutions. *Cutter*, 544 U.S. at 709.

In the Ninth Circuit, a plaintiff bringing a RLUIPA claim must first show a "substantial burden" on his exercise of religion.  *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008). Although RLUIPA does not define "substantial burden," the Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent.  That is, a 'substantial burden, on religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier*, 418 F.3d at 995 9quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  The burden need not concern a religious practice that is compelled by, or central to, a system of religious belief, *see* 42 U.S.C. § 2000cc-5(7)(A); however, the burden must be more than an inconvenience. *Navajo Nation v. U.S. Forest Service,* 479 F.3d 1024, 1033 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9th Cir. 2008) (internal quotations and citations omitted).  The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *Id.*, 479 F.3d at 1033 (internal citations omitted).

Rodriguez asserts that pursuant to ARs 810 and 810.1, Satanism is not a formally recognized religion by NDOC. As a result, he argues that he and other inmates who practice Satanism are precluded from: (1) possessing or obtaining an alter, alter cloth, amulets, bell, chalice, elixir, herbs and incense, gong, medallion of a pentacle or pentagram of Satan, parchment paper, phallus, picture of Baphemet, black hooded robe, and a talisman; (2) being able to use a dark room or space for rituals; and, (3) being able to celebrate the high holy days of Satanism (i.e. one's own birthday, Walpurgisnacht, Halloween, and the equinoxes).  (ECF No. 1-1 at 6-7.)  Rodriguez states that each of these, particularly the religious objects, is an integral part of Satanism.  (ECF Nos. 1-1, 15.)

Rodriguez has failed to establish that he has a likelihood of success on the merits because it is unclear whether Rodriquez properly requested that Satanism be recognized as a religion as required by properly submitted Religious Accommodation Forms. Although Rodriquez claims that he failed three separate RRT forms requesting that Satanism be formally recognized, the evidence provided in opposition to Rodriquez's motion contradicts Rodriquez's assertions and indicates that Rodriquez failed to follow any of the proper procedures to request for a religious accommodation in order to Satanism to be formally recognized. (*See* ECF No. 17-4). If Rodriquez failed to properly request a religious accommodation, he cannot prevail on the merits of his claims.

However, even if that were not the case, Rodriquez's claims are also likely to fail on the merits because Rodriquez has not shown that the failure to recognize Satanism as a designated faith places a substantial burden on his ability to practice his faith or that there is not a compelling interest served by the imposition of ARs 810 and 810.1.

> i.   *Substantial Burden*

First, Rodriquez has provided no evidence that he is currently unable or precluded from practicing his faith in the absence of Satanism being formally recognized by NDOC pursuant to ARs 810 and 810.1. Rather, Rodriquez's motion simply concludes, without explanation, that the use of the aforementioned religious objects are integral to Satanic rituals. However, there is no explanation how his right to practice his Satanic faith is substantially burdened by the failure to provide or allow the religious artifacts in the prison at this time.[2] Rodriquez's conclusory statements do not demonstrate that his religious beliefs are substantially burdened.

---

[2]   In fact, Rodriquez's assertions are inconsistent as to whether he can practice his religion, sometimes stating that not being recognized by NDOC "entirely prevent[s]" Satanists from being able to practice (ECF No. 15), while at other times stating that it merely "restricts Plaintiff from exercising his religion . . ." (ECF No. 7.)  For example, Rodriquez states he cannot access the religious text of Satanism (ECF No15 at 3), yet in his complaint he cites directly to pages within the text.  (ECF No. 7 at 6-7.)

|    |    |
|----|----|
| 1  |            *ii.*    *Compelling Governmental Interest and Least Restrictive Means* |

        By contrast, Dzurenda has satisfied his burden of showing a compelling governmental interest for ARs 810 and 810.1. Dzurenda has a clear compelling interest in preserving the safety, order, and efficient management of ESP. (ECF No. 17 at 7-8.) The Supreme Court interpreted the RLUIPA to allow for religious accommodation only insofar as it does not infringe on the need for prison order and safety. *Cutter*, 544 U.S. at 722. Indeed, the Court quoted with approval the RLUIPA drafters' concern that "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources." *Id.* at 723 (quoting S.Rep.No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892-1900.)

        Dzurenda alleges that requiring inmates apply to have a new religion or religious practice recognized, was the least restrictive means to ensure a safe and secure environment for the penal institution. (ECF No. 17 at 7-8.) Official recognition of a religion allows an inmate to obtain and possess objects of religious significance that would otherwise not be allowed. (ECF Nos. 15, 17.) Prison officials would have a difficult time safely monitoring and controlling the practice of religion, and the religious objects associated with that practice, if all inmates were indiscriminately permitted to possess those objects. When applying the RLUIPA, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Cutter*, 544 U.S. at 720. Increasing the availability of religious objects, including but not limited to chalices, herbs and incense, and hooded robes, would increase the risk of danger from these objects to other inmates and security officials.

        In sum, Dzurenda has demonstrated a compelling interest in restricting prisoner access to religious objects and requiring that new faith groups apply to be officially recognized a religion, and shown that he is employing the least restrictive means to further this interest. Whereas, Rodriuez failed to articulate the importance of the religious objects

1 | to rebut Dzurenda's claimed compelling interest.  Accordingly, since Rodriguez has not

2 | shown a substantial burden has been placed on his ability to practice Satanism and

3 | Dzurenda has shown a compelling governmental interest that is being enforced by the least

4 | restrictive means possible, Rodriguez has not proven he is likely to succeed on the merits.

5 |        B.    Irreparable Harm

6 |        Rodriguez must demonstrate also that irreparable injury is likely in the absence of

7 | injunction. *Winter,* 555 U.S. at 375.  Courts have held that constitutional violations generally

8 | constitute irreparable harm because they "cannot be adequately remedied through

9 | damages."  *Stormans,* 586 F.3d at 1138 (interpreting *Winter* and quoting *Nelson v.*

10 | *N.A.S.A.,* 530 F.3d 865, 881 (9th Cir. 2008)); *see also Warsoldier,* 418 F.3d at 1001-1002.

11 | However, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm

12 | is inconsistent with out characterization of injunctive relief as an extraordinary remedy that

13 | may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

14 | *Winter*, 555 U.S. at 367.  Irreparable injury is not clearly shown when a plaintiff has not

15 | demonstrated a likelihood of success on their claim.  *Sammartano v. First Judicial District*

16 | *Court, County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002).

17 |        Here, Rodriguez has not presented evidence of irreparable injury if the Court does

18 | not order Dzurenda to recognize Satanism as a religion and allow Rodriguez the religious

19 | objects afforded other recognized religions. As noted above, Rodriguez has failed to

20 | establish that he is entirely precluded from his ability to practice Satanism in the absence

21 | of its formal recognition as a religion at this time or in the failure to allow the religious

22 | artifacts he has identified. Therefore, he has also not shown that it is likely he will suffer

23 | irreparable injury.

24 |        C.    Balance of Hardships

25 |        A party seeking injunctive relief "must establish . . . that the balance of equities tips

26 | in his favor." *Winter*, 555 U.S. at 374.  In assessing whether a party has met this burden,

27 | the Court has a "duty . . . to balance the interests of all parties and weight the damage to

each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

Dzurenda clearly has an interest in maintaining order, security and discipline at the prison facility.  Issuance of any preliminary injunctive relief would require this Court to significantly interfere with NDOC policy.  Rodriguez argues, without any support, that if an injunction is entered the injury to Dzurenda will be inconsiderable.  (ECF No. 15.)  The Court is mindful that at trial Dzurenda will have to show that he "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice," but at this juncture, the security concerns top the balance of hardships in Dzurenda's favor. *See Greene v. Solano County Jail*, 513 F.3d 982, 989-90 (9th Cir. 2008).

D.     Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 376-77 (quotation marks and citation omitted).  "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." *Stormans*, 586 F.3d at 1138-39 (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003)).  "If however, the impact on an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.* at 1139.

The public clearly has an interest in the maintenance of prison security, order, and discipline. *Cutter*, 544 U.S. at 725 n.13.  The Court is not in a position to decide security decisions in prisons. *See Turner*, 482 U.S. at 89 (holding that the courts should not subject security-related judgments of prison officials to strict scrutiny).  Here, the public is not served where the Court's order would potentially pose a security risk and require NDOC to cater to Rodriguez.

**IV.    Conclusion and Recommendation**

For the reasons articulated above, the Court recommends Rodriguez's motion for temporary restraining order or preliminary injunction (ECF No. 15) be **DENIED**.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.   These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

**DATED:**  December 17, 2018.


_____
UNITED STATES MAGISTRATE JUDGE